[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant corporation, Oxford Micro Devices, Inc., is in the business of making chips to process images. As of early 1998, it had developed the A236 chip for the Army. The chip was extremely complicated, containing one million transistors and three million wires. Its manufacturing specifications ran over 300 pages. The defendant had SAMSUNG fabricate the chip. After it was fabricated and delivered to the defendant, tests were run on it and three known problems were discovered:
 1. erroneous writes to the first location of block writes to the external SDRAM;
 2. not writing to the internal RAM under some combination of multiple requests for access; and,
 3. erroneous operation of the serial port interface to a serial EEPROM.
The defendant's president, Steven Morton, testified that although his company was competent to solve the problems, that the engineer who did most of the work on the chip was no longer employed there and the balance of the staff had other priorities. Therefore, he went on the internet to find a company to do the work. He identified more than one, but eventually agreed to contract with the plaintiff for the necessary work. The original work to produce the chip was done with Viewlogic software and Morton made it known to the plaintiff that someone on behalf of the plaintiff would have to become proficient with that system in order to do the necessary simulations to correct the problems. Originally, the plaintiff was going to use Joseph Keith who was knowledgeable concerning Viewlogic, but he became unavailable. The plaintiff then proposed its Vice President, James Killingsworth, who was not proficient in Viewlogic. The defendant was aware of that, but accepted Killingsworth, with the additional term of the contract documents that "Seller will CT Page 9660 become proficient in the uses of the Viewlogic software at no expense to Oxford.
The parties entered into a contract. (See documents set forth in plaintiff's exhibits A-1 through A-6.) Rather than a flat fee for the work, the parties agreed on an hourly rate of $88.00 per hour, the hours not to exceed 450 without a written modification to the purchase order. The contract also called for weekly progress reports and itemization of hours. In Attachment B under the title "Termination" (plaintiff's exhibit A-5), it was made clear that the purchase agreement could be terminated by Oxford at any time and Oxford would be obliged "to pay only for labor hours and travel expenses incurred up to the point of termination."
The actual tasks of the contract were listed on Attachment A (plaintiff's exhibit A-3) listing seven tasks. Almost from the beginning, the parties were at odds over how to complete the project successfully. The plaintiff through both its president, Wayne Moore, and Killingsworth testified that they required an understanding of the design of the chip before they could eventually solve the problems with the chip. The defendant through Mr. Morton maintained that the plaintiff did not need to know anything about the design of the chip in order to load the simulator and run the tests. The contract documents, other than for the purchase order (plaintiff's exhibit A-6) were all prepared by the plaintiff. In the original quotation (plaintiff's exhibit A-1), the work is described as "Perform design changes to A236 chip at direction of Oxford" and in the purchase order (plaintiff's exhibit A-6) "Perform design engineering consulting services on Oxford's A-236 Video DSP Chip."
The parties remained at loggerheads as to how to proceed and Morton testified that he was concerned right from the first week of the project. The plaintiff did send progress reports, time billings and did not charge for any learning time on Viewlogic. The defendant paid for the first two invoices for services from July 18, 1998 through July 31, 1998. It did not pay for any more invoices although it obviously received them. Morton did contact Moore on several occasions complaining of methodology and a lack of progress, but did not terminate the purchase order as it had a right to. Finally, on September 13, 1998, the defendant did suspend or terminate the purchase order pursuant to the contract documents.
By that time, the plaintiff had expended a total of 356 hours of which 149 were not billed for because they pertained to familiarization with the Viewlogic software. of the 209 hours billed for as of the termination date, only 48 were paid for. The value of the 161 remaining billed hours at $88.00 per hour, and other authorized expenses, total $16,195.08, and CT Page 9661 the plaintiff is asking for statutory interest at ten (10%) percent from September 13, 1998.
The plaintiff has always maintained that it needed to do everything it did early on in order to successfully complete the project. The defendant totally disagrees. Wayne Moore testified that with the 243 hours still available to it, the plaintiff would have solved the problem. He described the so-called 80%-20% rule as applicable to this matter. It takes 80% of the time to find the problem and only 20% of the time to solve it.
The plaintiff never got the opportunity to utilize the full 450 hours so the court has no way to definitively conclude it would or would not have successfully completed the project, other than the plaintiffs' own opinion that it would, and there is no need for the court to conclude that fact.
Both parties in their briefs spent 90% of their time on the facts of the case and only 10% on the law. For this case that is all that is necessary because there is no quarrel on the law. The only quarrel is on the facts. The decision of necessity falls on the language of the party's understanding, the documents that make up their agreement and then applying common contract principles.
Simplistically stated the defendant's complaint is with how the plaintiff fulfilled the "tasks subject to contract" as listed on plaintiff's Exhibit A3 entitled "Attachment A." Seven tasks are listed. The first task is described as follows:
 "Siliconexion shall perform simulation and analysis of the foundry back-annotated net lists for the A236 Chip to develop an understanding of its functions, operation and technology sufficient to determine the cause of the following known problems."
The defendant's position is that that task had to be completed before any of the following six tasks could be commenced and it claims that was not done.
The problem with that argument is the agreement does not say that nor is it logical to conclude that that is a necessary implied term of the contract. The plaintiff certainly did not interpret it that way and it embarked on a broader path to problem solution. If the defendant wanted task one completed before any other task was embarked upon it was incumbent on it to make that term a specific condition of performance. It did not. CT Page 9662
The defendant did, when it felt it necessary, put in specific language to protect itself. It provided that the plaintiff could not bill for more than 450 hours without a written modification of the agreement. It provided that it would not pay anything for the plaintiff to become proficient in Viewlogic and it did not. It further provided it could terminate the contract whenever it chose without giving any reason or even being right. All of these provisions were totally for its benefit.
What the contract further provided was that on its termination of the agreement the defendant was obliged to pay for hours billed as of that time for labor and travel expenses to the point of termination. Now it wants the Court to ignore that language.
The defendant's president testified that he was unhappy with the plaintiff within one week. He was unhappy with the ability of James Killingsworth during his one week trip to Connecticut early on in the project. Despite his unhappiness with the services up to those points he did not exercise his right to terminate. He apparently remained unhappy with the plaintiff up until September 13, 1998 when he finally did terminate the contract. It owes the plaintiff for billed hours for labor and travel up to that day.
The court finds that the plaintiff has proven the allegation within its First Count, the Breach of Contract Count. It therefore awards the plaintiff $16,195.08 for its invoices through September 13, 1998 and further awards statutory interest of ten (10%) percent from that date.
GORMLEY, J.